UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
SONIA ARROYAVE,                                  :
                          Plaintiff,             :
v.                                               :          **OPINION AND ORDER**
                                                 :
UNIVERSAL REMOTE CONTROL, INC., JIN    :          20 CV 8040 (VB)
CHANG, and CHANG PARK,                           :
                          Defendants.            :
--------------------------------------------------------------x

Briccetti, J.:

Plaintiff Sonia Arroyave brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 296 of the New York State Human Rights Law ("NYSHRL"), alleging defendants Universal Remote Control, Inc. ("URC"), Jin Chang, and Chang Park discriminated and retaliated against her based on her gender, race, and national origin.

Now pending is defendants' motion for summary judgment. (Doc. #77).

For the reasons set forth below, the motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

The parties have submitted memoranda of law, declarations with exhibits, and statements of undisputed material facts pursuant to Local Civil Rule 56.1, which together reflect the following factual background.

I.     URC Structure

In 1995, defendant Park, a Korean-American man, founded URC, which is headquartered in Harrison, New York.  URC designs and manufactures residential and commercial automation systems.  In August 2001, Park hired plaintiff, a Hispanic woman, as a receptionist.  In 2006,

1

Park promoted plaintiff to an accounts payable position, provided her with training because "she did not have the relevant skills or experience initially," and gave her an eleven percent raise. (Doc. #81 ("Park Decl.") ¶ 8).

Defendant Chang, a Korean-American man, joined URC as director of finance in 2009, and in 2013, he was promoted to vice president of finance. (Doc. #83 ("Chang Decl.") ¶ 5). In this role, Chang oversees URC's accounting and information technology ("IT") departments, as well as its warehouse and the back-office operations of a Korean subsidiary. Plaintiff, as a member of the accounting department, began reporting to Chang. At that time, the entire accounting department was comprised of Chang, plaintiff, and another employee, Alicia Floyd, who is also a Hispanic woman.

In 2011, plaintiff and Floyd switched roles such that plaintiff handled accounts payable and Floyd handled accounts receivable to give each experience in both positions. Further, in January 2011, Robin O'Hearn, a Caucasian woman, joined the accounting department as a business analyst. In 2017, plaintiff was promoted to supervisor of accounts payable—which only involved a title change and salary increase, and did not involve plaintiff supervising any other employees—as plaintiff testified she was "basically doing the same functions that [she] had been doing before [her] promotion to supervisor." (Doc. #90-1 ("Pl. Tr.") at 28, 32).[1]

Between February 2019 and February 2021, URC's IT department was comprised of Roy Jeon, a Korean-American man, and Davall Clark, an African-American man. (Chang Decl. ¶ 7).

II.    Accounting Department Issues

In early 2019, URC was audited by the State of Ohio regarding payments of Commercial

---

[1]    Citations to "Tr. at _" refer to the page number at the top right-hand corner of each transcript page.

Activity Taxes ("CAT") to Ohio for tax certificates provided from 2016 to 2018 (the "Ohio Audit"). (Chang Decl. ¶ 29). During that period, plaintiff was "solely responsible for reviewing URC's CAT submissions for accuracy." (Id.). Plaintiff testified she made several "submissions to the State of Ohio that ended up being incorrect," and these errors triggered the Ohio Audit. (Pl. Tr. at 188–89).

During the summer of 2019, URC was audited by the State of Texas regarding its payment of sales taxes (the "Texas Audit"). Chang attests that he "delegated URC's response to the Texas audit to" plaintiff. (Chang Decl. ¶ 38). When the Texas Audit commenced, URC "could not provide supporting documentation," in the form of resale certificates, to demonstrate URC was exempt from paying "about $350,000 in sales tax revenue that was not remitted to Texas." (Id. ¶ 39). If URC could not provide the missing resale certificates, it would have to reimburse Texas $350,000 plus interest and penalties. (Id.)

Plaintiff testified she and Sarah Engstrom, a sales department employee who is a Caucasian woman, were responsible for checking whether the resale certificates were in order before the Texas Audit. (Pl. Tr. at 196). Once the resale certificates were provided to the auditor, the auditor determined many were missing necessary information. (Doc. #78-28 at ECF 3).[2] Although Chang attests plaintiff should have noticed the inaccurate certificates before the Texas Audit (Chang Decl. ¶ 40), plaintiff contends the certificates were not solely her responsibility, attesting "Engstrom collected the resale certificates, which were then sent to Chang for his approval." (Doc. #96 ("Pl. Decl.") ¶ 13).

---

[2] "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

Following the Texas Audit, Chang formed a group including plaintiff, Jeon, O'Hearn, and Floyd "to collect other states' missing resale certificates." (Doc. #78-29). As part of this group, Chang asked plaintiff "to research how many states required their own" resale certificate rather than the multi-jurisdictional one. (Chang Decl. ¶ 46).

On October 3, 2019, at a meeting with plaintiff, Jeon, O'Hearn, and Floyd, Chang asked plaintiff and Jeon how many states accept the multi-jurisdictional resale certificate. (Pl. Tr. at 204). Plaintiff testified she and Jeon responded that they believed four states accepted the multi-jurisdictional resale certificate. (Id. at 204–05). Chang replied he believed nine states did. (Id. at 205). In response, plaintiff contends she tried to explain the basis for her answer, but that Chang responded by saying something like, "I don't care what you think or what you understand. I want to know what is correct." (Id.).

III.   Plaintiff's October 2019 Complaint

Immediately after the October 3, 2019, meeting, plaintiff verbally complained to Josephine Marmo, URC's Human Resources ("HR") head, about Chang's behavior. The next day, plaintiff sent Marmo a written complaint by email, in which she stated she felt "depressed, miserable and intimidated by the repeatable of unreasonable actions of" Chang, including "[h]is unfair criticism blaming me for things I did not do," and that he "has humiliated me in front of others." (Doc. #78-30). Plaintiff's email recounted the events of the October 3 meeting, and stated Chang "insulted me in front of 3 people, he was rude with a condescending tone of voice." (Id.). Further, she wrote that after the Texas Audit began, Chang "yelled at me 2 times about reports in his office it was past 5 nobody was around to witness. After that there was another situation where he came over to my desk to ask me for a report . . . he came toward me very intimidating, did not give me any personal space he was right on my face." (Id.). In addition,

plaintiff wrote, "This is not the first time he yells at me, we had serious issues when he started working here I did formally complain about him." (Id.).

In the email, plaintiff recounted hearing Chang yell at Engstrom.  Plaintiff testified she heard Chang yell at Engstrom "two or three times."  (Pl. Tr. at 228).  Plaintiff also testified she heard Chang yell at Alice Webb, an African-American woman, "only once."  (Id. at 229–30).  In addition, plaintiff testified she heard Chang yell at eight male employees, who were Caucasian, Asian, or African American, each of whom Chang yelled at multiple times.  (See id. at 231–36).

IV.    Response to Plaintiff's October 2019 Complaint

Also on October 4, 2019, Park spoke to plaintiff about her complaints regarding Chang, which plaintiff recorded on her cellphone unbeknownst to Park.  (Pl. Tr. at 271).  During the meeting, plaintiff did not state her conflict with Chang was related to her gender, race, or national origin.  (See Docs. #95-32–95-33).  Park spoke to Chang later the same day, and according to Park's contemporaneous memorandum, he told Chang "to write a memo and notify [plaintiff] when her work is substandard" as "[s]uch documentation will be required if we have to terminate her for her poor work standard."  (Doc. #95-14).  Chang wrote the requested memo about plaintiff's performance, dated October 10, 2019, and submitted it to HR and Park.  (Doc. #78-29).

Thereafter, Park authorized an investigation into plaintiff's complaint against Chang, to be conducted by ADP, Inc. ("ADP"), which is URC's external HR vendor (the "ADP Investigation").  As part of the ADP Investigation, Erica McLennan of ADP and Marmo interviewed plaintiff, Chang, O'Hearn, and Engstrom.  During plaintiff's interview, she stated, "I'm treated differently from all the people from my department," but she did not say she believed her issues with Chang were related to her gender, race, or national origin.  (Doc. #95-37

5

at 5:40–7:32).  During Engstrom's interview, she discussed the Texas Audit and said Chang

"basically put all the blame on me" and stated to Engstrom in front of her colleagues, "we all

know this is your fault . . . this is all your fault."  (Ex. 95-22 at 0:20–1:41).

On October 24, 2019, plaintiff emailed McLennan and Marmo to express her concern

about whether she would be "protect[ed] . . . against my boss' abusive behavior," including him

giving her a "poor score that will affect my bonus considerably," "yell[ing] at me," and

otherwise "continu[ing] with his harassment and creating a hostile work environment."  (Doc.

#95-24).  In the email, plaintiff also describes Chang yelling at other URC employees, and states

she thinks she may remind Chang of "somebody that he dislikes a lot."  (Id.).

Ultimately, McLennan testified that the ADP Investigation concluded the issue between

plaintiff and Chang was "a business disagreement" and Chang's treatment "was not based on

[plaintiff's] race, gender, or national origin."  (Doc. #78-33 ("McLennan Tr.") at 82–83).

However, an email dated November 26, 2019, from McLennan to Park, copying Marmo, states

"NYS Preventing Harassment training will be assigned immediately" to Chang, and further,

Chang "will be sent to management training, sensitivity training and anger management."  (Doc.

#95-36).  In addition, McLennan stated that, if Chang acted towards plaintiff in the same way he

did on October 3, Park "has to terminate" Chang.  (Doc. #95-29 at 38:10–38:45).  And Marmo

determined plaintiff "was not involved in" preparing the deficient resale certificates at issue in

the Texas Audit, for which plaintiff alleges Chang blamed her.  (Doc. #95-16).

McLennan further testified she concluded plaintiff was not a "team player" (McLennan

Tr. at 99), but this is not reflected in any contemporaneous evidence from the ADP Investigation.

Following the ADP Investigation, at ADP's recommendation, URC promoted O'Hearn to senior manager so plaintiff and Floyd could report directly to O'Hearn instead of Chang. (McLennan Tr. at 78; Pl. Tr. at 312–13).

V.      Plaintiff's EEOC Complaint

On October 28, 2019, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race, gender, and national origin, as well as retaliation.  (Doc. #78-38).  Plaintiff wrote she has:

> been discriminated against, because i am a woman and my Hispanic background.  I am targeted and singled out and reprimanded in front of others.  My boss Jin Chang humiliates me, verbally abuses me continuously, demeaning me.  I complained that it is a hostile work environment and i am continuously being harassed.  . . .  Jin Chang is continuously increasing my work load to overwhelm me, accused me of wrong doings that has nothing to do with me.  Jin Chang is targeting me to terminate me after being with the company 18 years.

(Id. at ECF 2).  Plaintiff also detailed her belief that Chang and Park were "colluding against me" and identified other non-Asian female employees that were similarly discriminated against including Webb, O'Hearn, Engstrom, and Andrea Petti, the last of whom "who resigned due to the same treatment."  (Id. at ECF 4–5).

In her declaration, plaintiff also attests that Chang discriminated against non-Asian female employees Floyd, O'Hearn, Engstrom, Webb, and Marmo.  (Pl. Decl. ¶ 30).

Defendants proffer declarations of Webb, Floyd, O'Hearn, and Engstrom—all of whom worked with Chang.  (See Docs. ##79, 80, 84, 86).  In these declarations, they attest that, to the extent they or other employees had issues with Chang, they did not believe them to be based on gender, race, or national origin, and they did not believe he treated others differently based these characteristics.

VI.    URC Post-ADP Investigation Environment

After the ADP Investigation concluded, the accounting department was tense and stressful.  (Pl. Tr. at 326).  In a memo dated January 6, 2020, O'Hearn described an issue that occurred that day in the accounting department.  (Doc. #78-40 at ECF 3).  The memo stated plaintiff asked O'Hearn to approach Chang about commencing a wire transfer, but Chang asked for additional information requiring O'Hearn to return to plaintiff with questions.  O'Hearn wrote plaintiff's "tone was very harsh" and that their conversation proceeded "in a rather contentious fashion."  (Id.).  O'Hearn further wrote, "I fear that the situation will worsen based on [plaintiff's] anger and [Chang's] withdrawal from the situation.  It's like we're running a department where most of us don't speak to each other or walk on eggs."  (Id. at ECF 7).

VII.   Employee Performance and Compensation

All URC employees, including plaintiff, have received semi-annual bonuses for at least the last fifteen years.  Chang attests, "bonuses and raises are numerically tied to performance scores."  (Chang Decl. ¶ 14).  Thus, Chang testified "rather than objectively evaluating" employees including plaintiff in their performance evaluations, he gave them "high score[s]" so they would receive higher bonuses.  (Doc. #78-3 ("Chang Tr.") at 95).  On January 23, 2020, Chang informed employees, including plaintiff, that URC's performance evaluation scale was changing so the average score would not exceed an average of seventy-five out of one hundred. (Doc. #78-5).

From 2009 through the first half of 2019 (the final review period before plaintiff's October 2019 EEOC complaint), eighteen of plaintiff's twenty-one evaluations were in the low nineties, and plaintiff's overall average evaluation was 91.19.  (Doc. #95-41).  Plaintiff's January 2020 score, which covered the second half of 2019 and was the first score after URC's changes

were implemented, dropped to a seventy-one from a ninety-one in the prior evaluation period. (Doc. #78-4 at ECF 8; Doc. #78-6). Floyd's score dropped to a seventy-five from a ninety-one, and O'Hearn's score dropped to a seventy-nine from a ninety-two. (Doc. #78-6 at ECF 8; Doc. #95-41). Defendants argue plaintiff's "January 2020 score was reduced below the new average of 75 because of her poor performance on the Texas audit" and cite to paragraph fifteen of Chang's declaration to support this. (Doc. #89 ("Defs. 56.1 Stmt.") ¶ 25). However, Chang does not attest to this in his declaration, and plaintiff contests this rationale of why her performance evaluation was lower. (See Doc. #97 ("Pl. 56.1 Opp.") ¶ 25). For the second half of 2020, plaintiff received a score of 74.5. (Doc. #78-8 at ECF 5).

Chang claims he had previously complained about plaintiff's purportedly poor performance to Douglas Cole, URC's Vice President and General Manager. However, in an email to Marmo, Cole wrote that Chang scored plaintiff "90 and 91 out of a possible 100 score" which "is equivalent to a very good/excellent performance in URC's rating system" and "[a]ll discussion was consistent to this score or centered toward continued employee development and growth so that she could advance." (Doc. #95-27). Based on this feedback, Marmo concluded, in an email to McLennan, that Chang's "version is not supported by any party interviewed and/or documented" and noted that, according to Cole, Chang "never indicated Sonia's performance was poor." (Id.).

Chang attests that if plaintiff had received a seventy-five instead of a seventy-one for her January 2020 score, her bonus would have been only $218 higher, and her base salary for 2020 would have been only $777 higher. (Chang Decl. ¶ 15).

VIII.   <u>Plaintiff's Discrimination Lawsuit and Chang's Defamation Lawsuit</u>

On April 2, 2020, plaintiff's counsel sent Park a draft complaint with allegations similar to those ultimately filed in this action.  (Doc. #78-42; <u>see</u> Doc. #1).  Because the draft complaint named Chang as an individual defendant (Doc. #78-42), Park showed it to Chang.  (Park Decl. ¶ 17).  Park attests "Chang was deeply upset by the allegations and stated that they were false" and that Park agreed the allegations were false in light of the ADP Investigation.  (<u>Id.</u>).  In addition, Park attests Chang "wished to consult with an attorney about clearing his name," and because plaintiff's "allegations were related to [Chang's] employment at URC and ADP had cleared him of engaging in any unlawful action, I decided that URC would pay Chang's legal fees in connection with any action he took to clear his name."  (<u>Id.</u>).

Thereafter, on May 27, 2020, Chang filed a defamation lawsuit against plaintiff in Supreme Court, Westchester County (the "Defamation Lawsuit").  (<u>See</u> <u>Chang v. Arroyave</u>, No. 55459/2020 (Sup. Ct. Westchester Cnty., filed May 27, 2020).  In the Defamation Lawsuit, the court denied plaintiff's motions for dismissal and for summary judgment.

On September 29, 2020, plaintiff initiated this action by filing a complaint.  (Doc. #1). On December 28, 2020, plaintiff filed a first amended complaint (Doc. #24 ("FAC")), which Park attests that he reviewed and "noticed several allegations I believed were intentionally and knowingly false."  (Park Decl. ¶ 18).  The relevant allegations are that (i) during plaintiff's time working for Chang, he yelled at plaintiff once a week in front of colleagues (FAC ¶ 25); (ii) Chang "on a near-daily basis . . . called or emailed Plaintiff with basic or obvious questions" for which her assistance was unnecessary (<u>id.</u> ¶ 29); "[u]pon information and belief, nine male and mostly Asian colleagues who were similarly situated to (or less qualified than) Plaintiff were

promoted" from January 2015 through 2017 (id. ¶ 44); and (iv) Chang required only plaintiff to

work in the office during the early months of the COVID-19 pandemic.  (Id. ¶ 82).

      Plaintiff disputes this and asserts these allegations were substantially true or based upon

information and belief.  In support, she attests, soon after Chang started at URC, he

> started subjecting me to routine demeaning and belittling behavior leading,
> including, on at least a weekly basis, giving me unwarranted criticism, blaming me
> for his mistakes or the mistakes of others, calling or emailing me at the end of the
> day to answer basic questions for which my assistance was unnecessary, assigning
> me tasks outside the scope of my employment, blaming me for inefficiencies within
> the accounting department and implying that my statements were of no value.

(Pl. Decl. ¶ 5).

      However, according to Floyd—who sat next to plaintiff at work in an open floorplan—to

her knowledge, "Chang has never yelled at me or any other employee" and she "never witnessed

Chang yell at Arroyave on a weekly basis, or at all."  (Doc. #80 ("Floyd Decl.") ¶ 27).

      Plaintiff argues Floyd regularly left work before her.  (Pl. Decl. ¶ 3).  But Park, likewise,

attests he never heard Chang yell at plaintiff, despite sharing an office wall with Park.  (Park

Decl. ¶¶ 9, 20).

      Further, in the Defamation Lawsuit, plaintiff testified Chang did not yell at her between

2009 and 2012.  (Doc. #78-43 ("Pl. State Tr.") at 68–69).

      In addition, as to the nine promoted individuals, plaintiff identified these people at

her deposition and testified she was not qualified for the jobs to which these men were

promoted.  (See Pl. Tr. at 361–63, 366–67).  And Park attests only two of URC's forty-

four promotions between 2015 and 2017 went to Asian men.  (Park Decl. ¶ 22; see Docs.

##78-44–78-46).

IX.    <u>Plaintiff's Discipline and Termination</u>

Based on Park's belief that there was "high tension in the accounting department" that he thought "was worsened" by plaintiff's purportedly "false allegations" (Park Decl. ¶ 25), on February 18, 2021,  Park sent plaintiff a letter identifying the four allegations he investigated and thought were false.  (Doc. #78-48).  In the letter, Park stated plaintiff violated URC's Standards of Conduct, which prohibit dishonesty, and thus, he was placing plaintiff on two weeks of paid leave starting February 22, 2021, to give her "an opportunity to show that these four accusations you made are true."  (<u>Id</u>. at ECF 4).  If plaintiff failed to do so, Park stated she would be placed on "unpaid leave for the next 12 months" during which time she could "continue to put together [her] evidence" that the allegations were true.  (<u>Id</u>. at ECF 4–5).  However, if plaintiff did not prove the veracity of these four allegations within those twelve months, Park wrote, "your employment at this company will change from unpaid leave to termination, effective March 5, 2022."  (<u>Id</u>. at ECF 5).

The same day, plaintiff's counsel emailed defense counsel stating Park's letter of February 18, was "retaliatory harassment" and requesting it "be immediately withdrawn."  (Doc. #78-49).  Thereafter, defense counsel responded defendants were withdrawing the letter.  (<u>Id</u>.).

The following day, February 19, 2021, Park sent plaintiff another letter stating the "tense atmosphere that currently exists in the Accounting Department . . . [has] led me to believe that a change is necessary."  (Doc. #78-50).  Park stated an employee in the customer service department would be going on maternity leave in the spring and he "would like to offer [plaintiff] the opportunity to transfer to this role at the same pay and benefits, effective on Monday, February 22, 2021.  You will be able to train on the Product Return Authorization duties until the employee goes on leave and then hold this role during her leave."  (<u>Id</u>.).  The

letter did not say the transfer was mandatory, and Park concluded by saying, "Please let me know at your earliest convenience if this transfer is acceptable.  (Id.).

Defense counsel told plaintiff's counsel this was a lateral move, and that plaintiff was expected to report to work that Monday and transition to the new position.  (Doc. #78-51).  On February 22, 2021, plaintiff replied to Park saying she had questions before making a decision. (Doc. #78-53).  Plaintiff inquired whether the assignment was temporary, and if so, whether she would return to her prior role after the other employee returned.  (Id.).  Before Park replied, plaintiff responded to him again declining the transfer based on the belief it was a "demotion" and wrote, "As you stated in your letter you asked me if this is acceptable and I do not accept.  I will be at work tomorrow at 8:30 am."  (Doc. #78-54 at ECF 2).  In response, Park sent plaintiff a termination letter, effective that day.  (Id. at ECF 3–4).

## DISCUSSION

### I.   Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[3]

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

[3]      Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of her case on which she has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 322–23.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for her. Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  Bald assertions, completely unsupported by

admissible evidence, are not sufficient to overcome summary judgment.  Carey v. Crescenzi, 923

F.2d 18, 21 (2d Cir. 1991).

II.       Title VII and NYSHRL Hostile Work Environment Claims

Defendants argue plaintiff cannot, as a matter of law, establish a Title VII hostile work

environment claim against URC, or a NYSHRL hostile work environment claim against Chang,

because no reasonable jury could conclude plaintiff was subject to a hostile work environment

because of her gender.

The Court disagrees.

A.       Legal Standard

"Hostile work environment claims under Title VII and the NYSHRL are governed by the

same standard."  Tolbert v. Smith, 790 F.3d 427, 438 (2d Cir. 2015).  To demonstrate a hostile

work environment claim, "a plaintiff must produce enough evidence to show that the workplace

is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment."  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir.

2014).

"[T]he test has objective and subjective elements:  the misconduct shown must be severe

or pervasive enough to create an objectively hostile or abusive work environment, and the victim

must also subjectively perceive that environment to be abusive."  Rivera v. Rochester Genesee

Reg'l Transp. Auth., 743 F.3d at 20.

In considering whether a plaintiff has met this burden, courts should examine the totality

of the circumstances, including:  "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with the victim's job performance." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d at 20.  Moreover, "as a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

It is "axiomatic" however, that a plaintiff asserting a hostile work environment claim under Title VII must show sufficient evidence the at-issue conduct occurred "because of an employee's . . .  protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added).   But the Second Circuit has "cautioned that a hostile work environment claim need not be supported by direct evidence of explicit . . . harassment" based on a protected characteristic as "[c]ircumstantial evidence may do." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d at 23.  A plaintiff is not "required to demonstrate that his [protected characteristic] was the only motivating factor.  He need[s] to show only that a reasonable fact-finder could conclude that [the protected characteristic] was a motivating factor in the harassment." Id.  An inference of discriminatory intent may be derived from a variety of circumstances, including, "invidious comments about others in the employee's protected group," "the more favorable treatment of employees not in the protected group," or "the sequence of events leading to the plaintiff's discharge." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

B.    Analysis

Plaintiff has proffered sufficient evidence, considered as a whole, to raise a genuine issue of material fact as to whether she was subject to alleged harassment by Chang because of her protected characteristics, and that such harassment was sufficiently severe and pervasive to create a hostile work environment.

Here, although plaintiff has not identified any facially gender-, national origin-, or racial-based comments by Chang or other direct evidence of discrimination based on such protected characteristics, plaintiff supplies sufficient circumstantial evidence that Chang targeted plaintiff and other non-Asian female employees at URC by yelling at and demeaning them more frequently than he did similarly situated male employees. See Alfano v. Costello, 294 F.3d at 377. Specifically,

    i.    Plaintiff attests that Chang subjected other non-Asian female employees to similar discrimination, including Alicia Floyd, Robin O'Hearn, Sarah Engstrom, Alicia Webb, and Josephine Marmo. (Pl. Decl. ¶ 30). Further, in her EEOC complaint, plaintiff alleged Chang discriminated against another female employee, Andrea Petti. (Doc. #78-38);

    ii.    Plaintiff attests to Chang disciplining non-Asian female employees for errors they did not commit and acting in a hostile manner towards them, while he did not discipline Asian male employees for others' mistakes or act hostilely towards them. (Pl. Decl. ¶ 30); and

    iii.    Plaintiff provided an email from Erica McLennan after the ADP Investigation, which recommended "NYS Preventing Harassment training will be assigned immediately to" Chang and that he should also be sent to "management training, sensitivity training and anger management." (Doc. #95-36). Further, McLennan stated that Park "has to terminate" Chang if Chang continued to act towards plaintiff in the same way he did on October 3. (Doc. #95-29 at 38:10–38:45).

Defendants attempt to undermine plaintiff's evidence by pointing to evidence that purportedly shows Chang is typically "collegial, but he is prone to outbursts directed at others, male or female, when he is under stress."  (Doc. #99 ("Defs. Reply") at 4).  Although defendants are correct there is evidence supporting this statement, the Court cannot conclude, as a matter of law, that Chang's outbursts were not amplified against women.

For example, defendants point to documentary evidence indicating Engstrom, a Caucasian female, told HR that Chang "doesn't know how to speak to people" and when "he's stressed, then everyone else is getting the brunt of it."  (Doc. #95-19).  However, the same notes indicate that, when Engstrom was asked about her current working relationship with Chang, she replied, "sometimes he's rude and condescending and I can't stand talking to him.  I try to justify it on the cultural difference, but I don't think that's what [it] is.  He doesn't know how to speak to people and he needs management skills."  (Id.).  Engstrom also recounted Chang "harassing" her, and said, "This is not the first time I feel like he's been a complete asshole to me, or anybody I've heard him speak to other people inappropriately and blatant disrespect.  He kept blabbering about [the Texas Audit] being my fault."  (Id.).  Finally, Engstrom said she almost filed a complaint against Chang but "decided to let it go" and that Chang also spoke to another Caucasian female employee, O'Hearn, "unprofessionally."  (Id.).  This evidence could fairly support a conclusion that Chang treated both men and women poorly at times, but treated women markedly worse, and may have disproportionately blamed them for workplace issues.  See Brown v. Henderson, 247 F.3d at 253–54 ("[W]hat matters in the end is not how the employer treated other employees, if any, of a different sex, but how the employer would have treated the plaintiff had she been of a different sex.").

Defendants also point to notes of a conversation between O'Hearn and HR, in which she states regarding Chang, "When he gets upset about something, he reacts and it doesn't come across well."  (Doc. #95-18).  It is true O'Hearn said this and recounted that Chang had reacted similarly to her and to an Asian male colleague, Roy Jeon.  Nevertheless, defendants omit that O'Hearn stated she believed Chang "treats people differently" and was "harder on" plaintiff, including "thank[ing] everyone else but not" plaintiff during the resale certificates process.  (Id.). Finally, O'Hearn said she did not have "a problem" with Chang because she is "accustomed to the culture" and she is "a lot older" and had "been around the block a little bit more."  (Id.).  This evidence could fairly support a conclusion that although male employees sometimes were subjected to Chang's wrath, he treated female employees worse.  In particular, a jury could conclude O'Hearn's comment is alluding to an earlier workplace era in which women were treated with less respect than men.  And O'Hearn's testimony could also support a jury's conclusion that some female employees were simply less bothered by this disparate treatment than plaintiff.

Finally, defendants submit the declarations of four female URC employees who worked with Chang, in which they attest that they did not believe any issues they or other employees had with Chang were based on gender, race, or national origin, and they did not believe he treated others differently based these characteristics.  (See Docs. ##79, 80, 84, 86).  Based on this evidence, defendants argue there is no genuine factual dispute that Chang's treatment of plaintiff was not motivated by her protected characteristics.  However, as plaintiff argues, these employees have "seen Plaintiff ostracized and summarily discharged" as a result of her allegations (Doc. #98 ("Pl. Opp.") at 16), which could reasonably motivate these remaining employees not to levy complaints, creating credibility assessments that must be decided by a

jury.  See Rogoz v. City of Hartford, 796 F.3d 236, 245 (2d Cir. 2015) ("[T]he court may not make credibility determinations or weigh the evidence.  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge.") (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

In short, taken together and viewed in a light most favorable to plaintiff, plaintiff's account of disparate discipline by Chang and the accusations of harassing and potentially disparate treatment made against Chang by other non-Asian women—even if some of these women state they do not believe it to be based on their protected characteristics—raise a triable issue of gender-, national origin-, or racial-based animus.  See Alfano v. Costello, 294 F.3d at 377 ("[I]t may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build her case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent.").  Thus, although defendants put forth evidence that may undermine plaintiff's claims, this does nothing more than create a triable issue of fact that must be resolved by a jury.  See, e.g., Chambers v. TRM Copy Centers Corp., 43 F.3d at 37 ("The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a motion for summary judgment at the prima facie stage is de minimis.").

Accordingly, plaintiff's Title VII and NYSHRL hostile work environment claims shall proceed.

III.   Title VII and NYSHRL Retaliation Claims

Defendants argue the Court must grant summary judgment on plaintiff's Title VII retaliation claim against URC, and plaintiff's NYSHRL retaliation claim against Chang and Park.

The Court disagrees as to the alleged retaliatory acts of plaintiff's termination and change in compensation, but agrees as to the alleged retaliatory act of Chang's state-court defamation lawsuit against plaintiff.

A.     Legal Standard

A claim for retaliation under Title VII is governed by the burden-shifting analysis laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Chen v. City Univ. of N.Y., 805 F.3d 59, 70 (2d Cir. 2015).  To make out a prima facie case of retaliation under Title VII, a plaintiff must show that she (i) "participated in a protected activity," (ii) "suffered an adverse employment action," and (iii) "that there was a causal connection between her engaging in the protected activity and the adverse employment action."  Id.

A "protected activity" entails "action taken to protest or oppose statutorily prohibited discrimination."  Jarrell v. Hosp. for Special Care, 626 F. App'x 308, 311 (2d Cir. 2015) (summary order).  Therefore, complaints of unfair treatment or "generalized grievances about an unpleasant or even harsh work environment, without more . . . fail to rise to the level of protected activity."  Green v. Mount Sinai Health Sys., Inc., 826 F. App'x 124, 125 (2d Cir. 2020) (summary order).  "The onus is on the speaker to clarify to the employer that [she] is complaining of unfair treatment due to [her] membership in a protected class."  Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009).

To establish an adverse employment action for purposes of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

For purposes of a retaliation claim, causation can be established:  "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus against the plaintiff by the defendant."  Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d. Cir 2000).  Moreover, the plaintiff must establish "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).  Thus, "Title VII retaliation claims require proof that the desire to retaliate was the but-for case of the challenged employment action."  Lively v. WAFRA Inv. Adv. Grp., 6 F.4th 293, 304 (2d Cir. 2021).

Temporal proximity between the adverse action and the protected activity may be sufficient to establish a prima facie element of causation on its own.  Parron v. Herbert, 768 F. App'x 75, 77 (2d Cir. 2019) (summary order).  But "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  Chung v. City Univ. of New York, 605 F. App'x 20, 23 (2d Cir. 2015) (summary order).

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action."  Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013).  If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation."  Id.

22

"[A]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 25 (2d Cir. 2014).

Although previously the same standard applied to Title VII and NYSHRL retaliation claims, in 2019, the NYSHRL was amended to relax the standard for retaliation claims.  Everett v. N.Y.C Dep't of Educ., 2023 WL 5629295, at *14 (S.D.N.Y. Aug. 31, 2023) (motion to dismiss)  ("[T]he NYSHRL test for retaliation only has become easier to satisfy than Title VII following [the 2019] amendment.").  "While New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL, courts in this District have interpreted the amendment as rendering the standard for claims closer to the [broader] standard of the" New York City Human Rights Law.  Kaye v. N.Y.C. Health & Hosps. Corp., 2023 WL 2745556, at *17 (S.D.N.Y. Mar. 31, 2023).  In any event, a party who satisfies the requirements of a Title VII retaliation claim also satisfies the requirements of a NYSHRL retaliation claim.  See Everett v. N.Y.C Dep't of Educ., 2023 WL 5629295, at *14.

   B.   Analysis

Here, plaintiff asserts defendants retaliated against her by pointing to three retaliatory acts:  (i) plaintiff's termination; (ii) her lowered salary increase and decreased bonus; and (iii) Chang's defamation lawsuit against her.

      1.   Plaintiff's Termination

As to plaintiff's termination, defendants argue plaintiff's retaliation claim fails as a matter of law because Park had a legitimate non-retaliatory reason for terminating plaintiff, which she has failed to show is pretext.  That is, defendants argue Park terminated plaintiff based on his "reasonabl[e] conclu[sion] that she was intentionally lying in court documents" (Doc. #92

("Defs. Mem.") at 23–24), and because she refused a transfer to cover for another employee on leave.

Defendants are correct that in some scenarios, evidence that an employee fabricated allegations of discrimination could constitute a non-retaliatory reason for discipline.  See, e.g., Polite v. VIP Cmty. Servs., 2022 WL 9847075, at *3 (S.D.N.Y. Oct. 17, 2022) (adopting report and recommendation), appeal dismissed, No. 22-2970 (2d Cir. May 18, 2023).  However, here, defendants terminated plaintiff before giving her an opportunity to substantiate the contested allegations or investigate their veracity.  Nevertheless, assuming without deciding that defendants have proffered proper non-retaliatory reasons, plaintiff has put forth sufficient evidence from which a jury could fairly conclude defendants' proffered reasons are pretext for retaliation and that plaintiff was fired because of her discrimination complaint.

First, on February 18, 2021, less than two months after plaintiff filed the FAC, Park sent plaintiff a letter stating he was placing plaintiff on a paid two-week leave to prove that four specific allegations in her FAC (which he believed to be false) were true.  Thereafter, Park's letter said, plaintiff would be placed on a year of unpaid leave, and if she "fail[ed] to demonstrate the truth of these allegations within that 12 month period, your employment at this company will change from unpaid leave to termination, effective March 5, 2022."  (Doc. #78-48 at ECF 4–5).  This letter was withdrawn after plaintiff's counsel emailed defense counsel stating the letter is "retaliatory harassment" and requested that it "be immediately withdrawn."  (Doc. #78-49).  The next day, however, Park sent plaintiff another letter offering her the "opportunity" to accept a voluntary transfer to another department to cover another employee's maternity leave, but terminated plaintiff's employment when she declined to accept it.  (See Docs. ##78-53–78-54).

24

Second, the fact that defendants terminated plaintiff without first establishing whether her allegations in the FAC were actually fabricated is evidence of pretext itself because defendants did not investigate or allow plaintiff to prove her allegations before firing her, despite initially offering her a chance to do so.  Unlike in Polite v. VIP Community Services, in which the plaintiff made an internal complaint that the employer's HR department conclusively determined to be fabricated before he was fired, 2022 WL 9847075, at *2, here, defendants did not investigate or allow plaintiff time to prove her allegations before they fired her.

Thus, the temporal proximity plus the content of and context surrounding these communications support a reasonable inference that plaintiff's filing the FAC was the real reason behind plaintiff's termination, and that her refusal to accept the proposed "voluntary" transfer or that she allegedly lied in the FAC (which, at that time, defendants had not investigated) were pretextual reasons for her termination.

Accordingly, plaintiff's retaliation claims shall proceed against defendants URC and Park to the extent they are based on plaintiff's termination.

2.    Plaintiff's Compensation

Defendants argue plaintiff's receipt of a smaller salary increase and reduced bonus as compared with prior years was likewise not retaliatory, because it instead resulted from URC changing its company-wide performance evaluation scale (which represents a legitimate nonretaliatory reason for the compensation changes).  In addition, defendants justify the lower compensation increases in their Rule 56.1 statement, by arguing plaintiff's "January 2020 score was reduced below the new average [under the new performance evaluation scale] . . . because of her poor performance on the Texas audit," relying on Chang's declaration.  (Defs. 56.1 Stmt. ¶ 25; Chang Dec. ¶ 15).

Again, however, plaintiff has offered sufficient evidence from which a reasonable jury could conclude these reasons were pretext. Specifically, regarding defendants' claim that the company-wide performance evaluation scale changed, plaintiff has proffered evidence that this alone could not have caused the full reduction in her score (and resulting compensation changes) because she identifies other employees whose scores were similar to hers before the scale change that received higher scores than plaintiff after the change. (See Doc. ##78-6 at ECF 8; Doc. #95-41 (plaintiff's score dropped to a seventy-one from a ninety-one, but Floyd's score dropped to a seventy-five from a ninety-one, and O'Hearn's score dropped to a seventy-nine from a ninety-two)).

Regarding defendants' claim that plaintiff's performance on the Texas Audit caused the decrease, plaintiff offers evidence that (i) the resale certificates for the Texas Audit were not her sole responsibility, but shared with Chang and Engstrom (Pl. Tr. at 196); (ii) Engstrom's account that Chang blamed Engstrom (but not plaintiff) for the resale certificate issues identified in the Texas Audit (Ex. 95-22 at 0:20–1:41); and (iii) Marmo's conclusion, after investigation, that plaintiff "was not involved in the process at all" for the resale certificates that caused the issues with the Texas Audit. (Doc. #95-16).

In addition, Marmo's investigation determined Chang "never indicated Sonia's performance was poor" and that Chang's "version [of plaintiff's performance] is not supported by any party interviewed and/or documented." (Doc. #95-27).

Thus, drawing all reasonable inferences in plaintiff's favor, she has offered sufficient evidence from which a jury could conclude defendants' proffered reasons for her reduced compensation were pretextual.

Accordingly, plaintiff's retaliation claims shall proceed against defendants URC and Chang to the extent they are based on her lower salary increase and decreased bonus.

3.      Chang's Defamation Lawsuit

Defendants argue Chang's state-court defamation lawsuit against plaintiff is not baseless because it has survived a motion to dismiss and a motion for summary judgment, and therefore cannot constitute an adverse action.

The Court agrees.

"To sustain a claim of retaliation based on the filing of a lawsuit . . . the plaintiff must allege that the lawsuit" "was filed both with a retaliatory motive" and "was filed without a reasonable basis in fact or law." Robinson v. De Niro, 2023 WL 4862772, at *32 (S.D.N.Y. May 25, 2023) (quoting Kim v. Lee, 576 F. Supp. 3d 14, 31 (S.D.N.Y. 2021) (ruling on motion to dismiss), aff'd, 2023 WL 2317248 (2d Cir. Mar. 2, 2023) (summary order)).

The second element, that the lawsuit be filed without a reasonable basis in fact or law, "derives, in part, from the protection the First Amendment affords the employer, as well as an employee, to petition the Government for redress of grievances and, in particular, to have access to the courts for the redress of those grievances." Robinson v. De Niro, 2023 WL 4862772, at *32 (citing Bill Johnson's Rests., Inc. v. N.L.R.B., 461 U.S. 731, 740 (1983)). However, "baseless litigation is not immunized by the First Amendment right to petition." Id. The Second Circuit noted for a claim or counterclaim to be "baseless," it "must have no basis in fact or sound reason. A claim is frivolous if it is based on an inarguable legal conclusion or fanciful factual allegation." Kim v. Lee, 2023 WL 2317248, at *3.

The Second Circuit recently considered whether an employer's lawsuit could comprise retaliation under another federal employment statute, the Fair Labor Standards Act ("FLSA"), in

a non-precedential summary order.  See generally Kim v. Lee, 2023 WL 23173248.  In that case,

the Second Circuit noted "district courts in this Circuit have held that baseless claims or lawsuits

designed to deter claimants from seeking legal redress constitute impermissibly adverse

retaliatory actions, even though they do not arise strictly in an employment context."  Id. at *3.

Thus, the Second Circuit "assume[d], without deciding, that frivolous counterclaims could well

dissuade a reasonable worker from pursuing" an employment claim under the FLSA, and

affirmed the district court's dismissal of the plaintiff's retaliation claim based on a finding that

the allegedly retaliatory lawsuit was not baseless or frivolous.  Id.

Here, defendants have presented evidence that the Defamation Lawsuit is not baseless or

frivolous because it survived plaintiff's motions to dismiss and for summary judgment in state

court.  At least one court in this District has held that an allegedly retaliatory claim was "neither

baseless nor frivolous" when the allegedly retaliating party's "claims survived a motion to

dismiss (and now, summary judgment)."  Zurich Am. Life. Ins. Co. v. Nagel, 590 F. Supp. 3d

702, 737 (S.D.N.Y. 2022) (involving retaliation claims under the ADEA and NYSHRL), recons.

denied, 2022 WL 1173885 (S.D.N.Y. Apr. 20, 2022).  Although this Court cannot opine on the

likely outcome of the Defamation Lawsuit, the Court agrees the Defamation Lawsuit cannot be

considered an adverse action because, as a lawsuit that is neither baseless nor frivolous, its filing

cannot be considered an action that would dissuade a reasonable worker from making or

supporting a charge of discrimination.

Accordingly, plaintiff's retaliation claims must be dismissed as to defendants Chang and

URC, to the extent they are based on the Defamation Lawsuit.

IV.    NYSHRL Aiding and Abetting Claims

Defendant Park argues plaintiff's aiding and abetting retaliation claim against him—to the extent it is based on the plaintiff's change in compensation and Chang's Defamation Lawsuit—fails because (i) there is no underlying discrimination or retaliation; and (ii) Park did not provide substantial assistance to Chang in any violation.[4]

The Court agrees.

The NYSHRL permits liability against an individual defendant who aided or abetted conduct giving rise to a claim of discrimination or retaliation.  N.Y. Exec. Law § 296(6).  To be liable, a defendant must have actually participated in the conduct giving rise to the claim.  See Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004).  However, "an individual cannot aid and abet their own discriminatory conduct."  Boonmalert v. City of New York, 721 F. App'x 29, 34 (2d Cir. 2018) (summary order) (citing Strauss v. N.Y. State Dep't of Educ., 26 A.D.3d 67 (3d Dep't 2005)).  And "[a]iding and abetting is only a viable theory when an underlying violation has taken place."  Chen v. City Univ. of N.Y., 2014 WL 1285595, at *12 (S.D.N.Y. Mar. 31, 2014), aff'd, 805 F.3d 59 (2d Cir. 2015).

---

[4]      In her opposition, plaintiff states, "[t]o the extent that Defendants seek summary judgment on Plaintiff's aiding and abetting clams against Park with respect to the hostile work environment claim and against Chang with respect to the retaliatory termination claim, Plaintiff does not oppose Defendants' motion.  (Opp. at 25).  Accordingly, the Court dismisses plaintiff's NYSHRL aiding and abetting claim (i) against Park for a hostile work environment, and (ii) against Chang for retaliation, based on Park's purported retaliatory termination of plaintiff.

Further, to the extent plaintiff asserts aiding and abetting claims against Chang for (i) creating a hostile work environment and (ii) retaliation premised on plaintiff's lesser salary increase and reduced bonus, such claims fail as a matter of law because Chang "cannot aid and abet his . . . own violation of the statute."  Baptiste v. City Univ. of N.Y., 2023 WL 4266914, at *6 (S.D.N.Y. June 29, 2023) (quoting Hardwick v. Auriemma, 116 A.D.3d 465 (1st Dep't 2014)).

Because the Court is granting summary judgment for URC and Chang on plaintiff's retaliation claims premised on the Defamation Lawsuit, the Court agrees that Park could not have aided and abetted any such alleged retaliation on that basis.  See Gordon v. City of N.Y., 2018 WL 4681615, at *19 (S.D.N.Y. Sept. 28, 2018).

Plaintiff also claims Park aided and abetted URC and Chang's allegedly retaliatory reduction in plaintiff's salary increase and bonus.  Although this Court denied summary judgment for URC and Chang on this claim, even drawing all reasonable inferences in plaintiff's favor, she has not proffered sufficient evidence from which a jury could conclude Park actually participated in this conduct.  Plaintiff points to no evidence in the record regarding Park's involvement in her performance evaluation or her consequential reduced salary increase or decreased bonus.  Thus, the Court must grant summary judgment for Park on plaintiff's aiding and abetting retaliation claim, to the extent it is based on plaintiff's reduced salary increase or decreased bonus.

Accordingly, all of plaintiff's aiding and abetting claims must be dismissed.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's Title VII hostile work environment claim against URC and her NYSHRL hostile work environment claim against Chang shall proceed.  Further, plaintiff's Title VII retaliation claim against URC and her NYSHRL retaliation claim against Park and Chang shall proceed, but only to the extent they are premised on Park's termination of plaintiff and plaintiff's change in compensation as a result of the January 2020 performance review.

All other claims are dismissed.

A case management conference is scheduled for October 19, 2023, at 2:30 p.m..  The conference will proceed in person, at the White Plains courthouse, Courtroom 620.  Counsel shall be prepared to discuss the setting of a trial date and a schedule for pretrial submissions, as well as what efforts they have made and will continue to make to settle this case.

The Clerk is directed to terminate the pending motions.  (Docs. ##67, 77).

Dated:  September 14, 2023
        White Plains, NY

                    SO ORDERED:


                    _____
                    Vincent L. Briccetti
                    United States District Judge

31